IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SLB INSURANCE INC., | : | CIVIL ACTION |
| CHARLENE LEETS BAKER, | : | |
| and KIRISTIE BERRY, | : | |
| | : | |
| Plaintiffs, | : | NO.  06-4189 |
| v. | : | |
| | : | |
| BROWN & BROWN INC. and, | : | |
| SUSAN HEATH, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM  AND ORDER**

BUCKWALTER, S.J.                                                                               March 6, 2008

**I.   FINDINGS OF FACT**

 1. Plaintiff SLB is a corporation organized and operating under the laws of the Commonwealth of Pennsylvania. (Day 2, page 46, lines 14-19)

 2. Plaintiff SLB is a citizen of Pennsylvania maintaining its offices at 800 W. State Street, Suite 301, Doylestown, Pennsylvania. *Id*.

 3. Plaintiff Charlene Leets (a.k.a. "Shotzie") Baker (hereafter "Baker"), the principal of SLB, is a citizen of Pennsylvania who resides at 200 Pueblo Road, Doylestown, Pennsylvania.  (Day 2, page 46, lines 3-5)

4. Plaintiff Kiristie (a.k.a. "Kris") Berry (hereafter "Berry") is a citizen of Pennsylvania residing at 4 Olde Colonial Drive, Doylestown, Pennsylvania. (Day 1, page 102, lines 21-22)

5. Defendant Brown & Brown, Inc. (hereafter "Brown") is a corporation organized and operating under the laws of Florida. (Day 1, page 132, line 25 – page 133, line 8)

6. Defendant Brown is a citizen of Florida, maintaining its principal place of business at in Daytona, FL and also maintaining an office at 3101 W. Martin Luther King Jr. Boulevard, Suite 400, Tampa, Florida. *Id*.

7. Defendant, Susan Heath ("Heath"), is a resident of the State of Florida. (N.T., 10/15/07, p. 134.) She is an Executive Vice President at Brown, and manages, among other things, its comprehensive dental professional insurance plan, commonly known as the "Protector Plan for Dentists® (hereinafter the "Program" or "Plan"). The Program is based in Tampa, Florida. The Program offers a customizable package of professional malpractice, general liability, property, and workers' compensation coverage to dental professionals and practice groups.

8. Baker is the President and founder of SLB, and left her previous employment with Glen Center Insurance Associates ("GCIA") for full-time employment with SLB in late August, 2006. (N.T., 10/16/07, p. 46.)

9. Prior to leaving GCIA, Baker was the manager of GCIA's dental insurance sales and servicing team. (N.T., 10/16/07, p. 47-48.) GCIA was a small but successful unit of Insurance Innovators, Inc. Because it was seemingly well run, Baker operated with little oversight or direction. (N.T., 10/24/07, p. 22-23.)

10. Berry is the daughter of Baker, and left her previous job for full-time employment with SLB. (N.T., 10/15/07, pp. 103, 110.) She did so in reliance on representations made to her by Baker. (N.T., 10/15/07, p. 111.)

11. The Program (Finding of Fact #7) is offered to dental professionals and practices in 49 states plus Puerto Rico. The Plan is exclusively available through agents called State Administrators.

12. GCIA is a State Administrator for Brown and offers the insurance products provided by Brown's Program. (N.T., 10/15/07, p. 137.)

13. Brown's Professional Programs Division consists of dental, optometric and commercial insurance programs. (Day 1, page 134, lines 15-18)

14. Brown's dental program consists of at least two separate services. First, Brown provides professional liability insurance for dentists through a program with C.N.A. Insurance. (Day 1, page 134, line 19 – page 135, line 8)

15. Brown acts on a national level as a managing general underwriter for C.N.A. To run the program in each state, it appoints local "State Administrators" to

3

market the C.N.A. professional liability policies. (Day 1, page 134, line 19 – page 135, line 8)

16. Second, Brown provides workers compensation insurance to dentists through The Hartford. The Hartford acts as the underwriter, and Brown markets the policies. (Day 1, page 134, line 19 – page 135, line 8)

17. Brown does not specifically appoint State Administrators for The Hartford program, but allows its C.N.A. State Administrators to market the workers compensation policies in addition to the professional policies underwritten by C.N.A. (Day 1, page 135, lines 9-18)

18. Heath oversees all the business aspects of the dental program. (Day 1, page 134, lines 12-14)

19. Robyn Renner is Heath's executive assistant. (Day 2, page 52, lines 4-5)

20. Deborah "Debbie" Ionescu previously served as the underwriting manager for the dental program. (Day 1, page 6, lines 5-13; Day 2, page 51, lines 5-9)

21. Ionescu managed the underwriters at Brown who underwrite the C.N.A. professional liability policies. (Day 1, page 6, lines 5-13)

22. Yadhira Maldonado is an underwriter who formerly underwrote the professional liability policies for dentists located in Pennsylvania. Maldonado reported to Ionescu. (Day 2, page 51, lines 10-12)

23. The marketing for the Professional Programs Division is performed by Bernadette Green. As marketing manager, she reports directly to Heath. (Day 2, page 51, lines 21-24)

24. In order to market the dentists' insurance policies at a state level, Brown enters into "State Administrator Agreements" with local insurance agencies in each state. (Day 1, page 135, lines 19-24)

25. State Administrators are independent contractors and do not work for Brown. (Day 2, page 52, lines 11-15)

26. In the vast majority of states, Brown only has one State Administrator. In several of the larger states, such as Texas or California, Brown contracts with two administrators. (Day 1, page 135, line 25 – page 136, line 10)

27. From 1999 through July of 2006, Brown only had one Pennsylvania State Administrator -- Glen Center Insurance Associates ("Glen Center"), a division of Insurance Innovators Inc., based in Glenside, Pennsylvania. (Ex. P-1; Day 1, page 137, line 16 – page 138, line 22)

28. From September 29, 1999 until August 25, 2006, Plaintiff Baker was an employee of Glen Center. (Day 2, page 47, lines 22-24)

29. Although Baker managed the marketing of the C.N.A. and The Hartford policies for Glen Center, she reported to Insurance Innovators officials, who

5

made the administrative and business decisions for the company. (Day 2, page 48, line 19 – page 49, line 23; Day 4, page 4, line 24 – page 5, line 19)

30. Baker reported to Michael Kravitz, the Principal and President of Glen Center and Insurance Innovators, Chief Financial Officer Jim Wilson, and later, to Rich Marburg, the Chief Operating Officer. *Id*.

31. In 2005, Baker began to encounter increasing problems in her role as Manager of Glen Center. (Day 2, page 53, lines 4-7)

32. At some point in 2005, Insurance Innovators made the decision to go "paperless" and convert all of its documents into an electronic format. (Day 2, page 53, line 8 – page 55, line 14)

33. In July, 2005, Insurance Innovators began to scan all its documents into ImageRite, an electronic document storage program. *Id*.

34. Wilson and Marburg mandated that Insurance Innovators' documents would be scanned prior to those of Glen Center. *Id*.

35. As a result, the documents relating to dentists insurance policies and coverage were stored in three-foot high piles in the hallway of Insurance Innovators' office. *Id*.

36. Baker was frustrated by the effect this had on her ability to provide service to her dentists, to coordinate with Brown, and to respond to Brown's requests for

information. When dentists called Baker to ask about their policies, Baker was unable to access readily the applications the doctors had already sent her. *Id*.

37. As a result, she would need to call the dentists back and ask them questions about the applications they had already submitted to her. Likewise, when the underwriters called her with requests for information about doctors, Baker was unable to access the information quickly. *Id*.

38. In addition, the sloppy storage of sensitive information contained in the dentists' files led to potential violation of federal laws on privacy, namely HIPAA, 42 U.S.C. 1320, *et seq.* (2006). (Day 2, page 55, line 24 – page 57, line 3; Day 2, page 57, line 24 – page 58, line 19)

39. In October, 2005, Baker saw Bernadette Green, Brown's Marketing Manager, at the American Dental Association Conference in Philadelphia. (Day 2, page 58, line 20 – page 60, line 3)

40. Baker, Green, Brown's marketing representative, Jennifer Snodgrass, and Marie Wilson, an employee at Insurance Innovators, shared a meal together during the convention. *Id*.

41. After Baker raised the idea that she could become a state administrator, Green told Baker, "that's great - I do not have authority to give you advice on that...you need to speak to Heath. (Day 2, p. 216, lines 8-12, *Id*., p. 208).

42. Green told Baker that Heath had helped create new state administrators and transition business from an old state administrator to a new one. Specifically, she said Heath had "done it before" and could "do it again." *Id*.

43. Three weeks after that meeting, Baker called Heath and left her a message that based on her conversation with Green and Snodgrass, she would like to speak to Heath. Baker and Heath exchanged several messages, and finally spoke at some point in October, 2005. (Day 2, page 60, lines 4-20)

44. Either in that call or shortly thereafter, Heath and Baker agreed that Baker should fly to Tampa for a meeting on November 18, 2005. *Id*.

45. Baker flew to Tampa on November 17, 2005, along with her daughter, co-plaintiff Kiristie Berry, and Berry's young daughter. (Day 1, page 104, line 24 – page 105, line 6; Day 2, page 61, lines 2-24)

46. Berry, a single mother, at the time worked as the nurse manager for a large oral surgeons' office. (Day 1, page 103, lines 6-18; Day 2, page 61, lines 2-24)

47. Baker asked Berry to join them on the trip because she felt Berry's marketing experience and nursing background positioned her to be an asset if Baker formed a new company. (Day 1, page 106, line 17 – page 107, line 10; Day 2, page 61, lines 2-24)

48. On the night of November 17, Baker and Berry ate dinner with Maldonado, Ionescu, Green and Snodgrass at Maggianos in Tampa. Heath did not attend that dinner. (Day 1, page 12, lines 9-12; Day 2, page 62, lines 5-19)

49. Baker introduced Berry to the Brown employees and stated that she would be working with her if Baker became a State Administrator. (Day 2, page 62, lines 5-19)

50. During dinner, Baker, Maldonado and Ionescu discussed Baker's upcoming meeting with Heath, and agreed that it was an excellent opportunity for her. (Day 1, page 13, lines 9-13)

51. On November 18, Baker met alone with Heath at 10 a.m. in Heath's office. (Day 2, page 62, line 20 – page 64, line 5)

52. Baker informed Heath about the document problems at Glen Center, specifically that she was concerned that documents were not being shredded properly, were being kept in the hall, and were not being filed properly. (Day 1, page 141, lines 3-16; Day 1, page 141, line 24– page 142, line 5)

53. Heath then called Ionescu into the room, and instructed her to fly to Pennsylvania as soon as possible to perform an audit on Glen Center and Insurance Innovators. (Day 1, page 142, line 22 – page 143, line 4)

54. It was Brown's plans to terminate Kravitz and hire Baker as the state administrator for Pennsylvania, according to Ionescu. (Day 1, page 73, lines 16-22)

9

Heath's testimony differs on this issue (Day 2, pages 143-148), and no other Brown employee supports the idea regarding Brown's plan.

55. Some time after the November 18 meeting, Baker called Sue McFadden, Brown's Iowa State Administrator. McFadden confirmed to Baker that Brown had helped her create a new company and transitioned accounts from the old employer to her new company. *Id*.

56. Baker's testimony is corroborated by Mary Fran Mullan, a former Brown employee who negotiated with McFadden on behalf of Brown. Mullan testified that Brown transferred accounts from McFadden's prior employer to her new company. Mullan also testified that Brown helped McFadden create the new company, going as far as to issue her a loan. *See* Deposition of Mary Fran Mullan, viewed by the Court at trial and attached hereto as Exhibit A, at page 9, line 18 – page 10, line 15.

57. Ionescu visited Glen Center on December1, 2005 for the first audit, along with Maldonado. (N.T., 10/17/07, pp. 61-62.)

58. Ionescu gave GCIA a poor review at that time. Maldonado's findings were more favorable to GCIA. (N.T., 10/17/07, pp. 64, 67.)

59. Ionescu only reported her own findings to her superior, Susan Heath. (N.T., 10/17/07, p. 67.)

60. Ionescu met with Kravitz, GCIA's President, immediately following the December 2005 audit. She reported her findings to Kravitz, who challenged her and the bases for her opinions. (N.T., 10/24/07, p. 27-30.)

61. Mr. Kravitz had purposefully taken an adversarial tone with Ionescu at the urging of Plaintiff, Shotzie Baker. Baker assured Kravitz that Ionescu's opinions and criticisms were not reasonable and that GCIA's practices were sound. (N.T., 10/24/07, p. 28-31.)

62. Following the audit, Ionescu and Maldonado shared dinner with Baker and Berry on the evening of December 1 at a restaurant in Doylestown, PA. (Day 1, page 18, lines 3-8; Day 1, page 108, line 10 – page 109, line 7)

63. During dinner, Berry had a conversation with Ionescu, a former nurse, about leaving her job as a nurse and going into the insurance industry. (Day 1, page 19, lines 4-9; Day 2, page 73, lines 14-25)

64. After the December audit, Ionescu recommended to Susan Heath that GCIA's contract with Brown be terminated. Heath took this recommendation under advisement. (N.T., 10/17/07, p. 65.)

65. During the winter of 2006, Baker reported to Brown that GCIA had not cured the deficiencies identified by Ionescu. (N.T., 10/17/07, p. 68-69.)

66. Ionescu, pursuant to the direction of Heath, conducted a second audit in late April 2006. She again recommended to her superior that GCIA's contract be terminated. (N.T., 10/15/07, p. 143; Def Ex. 10.)

67. Heath relied on the accuracy and good faith of Ionescu's reporting. Heath was not made aware of significant information conflicting with Ionescu's recommendations. For instance, she was not told of Maldonado's positive findings nor was she told of information obtained from Kravitz and Rich Marburg of GCIA which might cast doubt on the veracity of Baker's complaints and Ionescu's findings. (N.T., 10/17/07, p. 66-68.)

68. Ionescu told Baker that Brown had to give Kravitz an opportunity to remedy the problems before termination. She would perform another audit, and if the problems persisted, Brown would terminate the contract. (Day 1, page 19, lines 10-25)

69. Heath admitted that she called Kravitz and told him to clean up his business practices as it related to the storage and disposition of customer information. (Day 1, page 144, lines 7-13)

70. In February, 2006, Baker and Heath both attended an advisory board meeting. During a break, Heath told Baker that Brown's attorney was heavily involved in the Zurich negotiations, and that she was having another attorney take over writing the termination letter to Glen Center. (Day 2, page 74, lines 2-15)

71. Ionescu visited the offices of Glen Center and Insurance Innovators again on April 25, 2006 for another surprise audit, the second audit. (Ex. D 13; Day 1, page 144, lines 14-23)

72. Prior to that audit on March 24, Baker in an e-mail to Ionescu asked "do you think it's still going to fly?" (Day 2, page 76, line 20)

73. Baker spoke to Ionescu a number of times between the period of December and April, May and June, and was involved in numerous e-mail correspondences with Ionescu regarding the termination of GCIA as state administrator. Specifically, in response to "do you think it's still going to fly?", Ionescu wrote, "I haven't forgotten about you. Susan has been out all week. So, on goes the battle." (See page 5).

74. Also, the e-mails between Baker and Ionescu frequently discussed personal matters as well.

75. Following the second audit in late April, and after consulting with Brown's legal staff, Heath sent a letter to GCIA dated July 24, 2006 advising that GCIA's status would be terminated as a State Administrator if it did not, within thirty (30) days, cure the bases for the declared breach of its State Administrator Agreement (N.T. 10/15/07, p. 145, 10/17/07, p. 84; Def. Ex. 4).

76. It was after this second audit in late April that Baker first talked to Heath about wanting to become a state administrator (N.T. 10/17/07, p. 70).

77. Heath viewed this as "awesome" as she had been after GCIA, which was concentrated in the Philadelphia area, to try to sell in the west. *Id*.

78. On the Friday before Memorial Day, 2006, Baker called Heath and was very upset because the termination letter had not yet gone out to GCIA (N.T. 10/17/07, p. 77, 78). Heath said don't worry about it, we'll get it out. Heath never promised to giver her GCIA's book of business at any time.

79. Later in the summer of 2006, Baker told Heath that she was thinking of going out on her own and get office space. Heath told her that it is solely her (Baker's) decision, in which she did not want to get involved or give advice. (N.T. 10/17/07, p. 79).

80. Following the second audit in late April, and after consulting with Brown's legal staff, Heath sent a letter to GCIA dated July 24, 2006 advising that GCIA's status would be terminated as a State Administrator if it did not, within thirty (30) days, cure the bases for the declared breach of its State Administrator Agreement. (N.T., 10/15/07, p. 145, 10/17/07, p. 84; Def. Ex. 4.)

81. Upon receipt of the July 24th letter, Kravitz, Marburg and Baker discussed its contents. (N.T., 10/16/07, p. 187.)

82. Baker expressed concern to Kravitz and Marburg that if GCIA's status as a State Administrator was terminated, she and the people she managed would be out of work. (N.T., 10/16/07, p. 187.) This concern could not have been sincere in light

of, among other things, the three year lease she and SLB Insurance had signed with the Leasor on May 31, 2006 (Plf. Ex, 9)

83. Prior to receiving the July 24 letter, Kravitz was "comfortable with what we're doing and Baker felt that it (business) was fine. (N.T. 10/24/07, pg. 30, 31).

84. GCIA came up with a satisfactory plan, and in early August 2006, Ionescu visited GCIA and confirmed that satisfactory practices were put in place. Correspondence from Heath rescinding the termination notice of July 24, 2006 soon followed. (N.T., 10/15/07, p. 147-48 and Plf. Ex. 22).

85. Baker knew, before resigning from GCIA, that she was not being given access to GCIA's book of business. In fact, her friend, Deb Ionescu, specifically advised her that she had to discuss with Heath the desire to pursue GCIA insureds. Ionescu suggested one potential option for Baker and SLB was to buy the book of business from GCIA. (Def. Ex. 32.)

86. Further, Baker knew that GCIA would not be terminated as a state administrator at the time she executed her own contract. (N.T., 10/16/07, p. 87-88.) She testified that she "was devastated" by GCIA's compliance with Brown's demands which only makes sense if from the very beginning (around October, 2005) her main objective was to have GCIA's state administrator status terminated.

87. Ultimately, despite knowing there were no promises of assured business from GCIA, Baker still wished to leave GCIA and strike out on her own as SLB.

88.     Baker and SLB did in fact become an additional State Administrator under the Program. (Def. Ex. 1.)

89.     However, Heath did not promise Baker or SLB they would replace GCIA as a State Administrator or take over GCIA's book of business, nor did Heath delegate anyone in her employ to make such promises.  (N.T., 10/17/07, p. 80, 82.)

90.     Baker and SLB entered into a State Administrator Agreement with Brown in late August 2006.  There are no facts which support Baker's allegations that Brown breached this contract.  (Def. Ex. 1.)

91.     CNA issued a producer code for SLB. (N.T., 10/17/07, p. 10-13.) Robyn Renner informed Baker by e-mail. (N.T., 10/17/07, p. 10-13; Def. Ex. 51.)

92.     Baker failed to access that producer code. Baker failed to contact either Robyn Renner or Brown's Information Technology department to request access to the producer code after September 1, 2007.  (N.T., 10/17/07, p. 12-14, 49-50.)  Hailey Stefan, Brown's IT Manager, was not in the office on September 1, 2006.  Stefan admits that upon her return to the office after the Labor Day Holiday she forgot to forward the code to Baker.  However, no employee of Brown ever intentionally prevented access by Baker or SLB to their username, password, or producer code. (N.T., 10/17/07, p. 20, 22, 49-51.)

93.     Although Baker claims to have attempted to contact Brown to obtain her producer code, such claims are not credible. Neither Stefan, Heath nor Renner

16

received any calls or e-mails requesting it. (N.T., 10/17/07, p. 20, 22, 48-51, 97.) The IT help desk, which is available 24 hours a day and 7 days a week, keeps logs of all contacts, but had none from Baker. (N.T., 10/17/07, p. 48-51.)

94. The Notes of Testimony suggests there was some confusion during the period of time beginning roughly with the termination letter of July to roughly the mid-September, 2006 primarily regarding the issue of broker of record (BOR) letters. This was caused primarily by Baker's efforts to secure customers of GCIA. The employees of Brown were generally trying to help Baker at this time period by responding to her inquiries about BOR's. (For example, see Day 2, pages 223, 224).

95. As fact finder, inferences fairly drawn from the evidence in this case are:

First, Baker was good at her job, was very knowledgeable about the business of marketing the plan, and she was and is a savvy person in her line of work.

Second, Baker, as manager of GCIA should never have let the problem which was the subject of the audits get to the point where a termination letter was sent to GCIA.

Third, these audits, brought about at her instigation, were motivated by her personal interest in getting a state administrator agreement of her own. This is also supported by her general growing dissatisfaction with GCIA management.

17

Fourth, she had to know that, unless she were the only state administrator in Pennsylvania, she could not within the normal recognized ethics of the business, go after GCIA's customers if GCIA were still a state administrator.

Fifth, when she realized that her plan of being sole administrator was not going to come about, she told Heath as represented in Heath's letter to her of September 12, 2006 that she no longer wanted to be a state administrator, even though her counsel subsequently disputed those facts as stated in the letter.

## II.   CONCLUSIONS OF LAW

Berry has failed to prove her fraudulent/negligent misrepresentation claim.

There was no statement of material fact that the plaintiff believed to be true but which in fact was false.  Berry claims that Ionescu misrepresented to Berry that she was making a good career decision.  First of all, this is not a fact; it's clearly an opinion. Berry was experienced enough not to rely upon someone's opinion but to do her own investigation before making a career change.  Brown could in no way intend or reasonably foresee that a reasonable person would rely on the opinion of one person (not the one in charge of making state administrators at that), in making a career change. Heath herself never made false statements to Baker or Berry.  The court specifically rejects plaintiffs' proposed findings of fact in that regard.

As to the alleged breach of contract, the facts found by the court do not support it.

Baker had the knowledge of the producer code, password or log in. She was assigned a producer code. If, as she claims, she did not have it, she knew how to get it by using the IT help desk, which she did not do.

Moreover, Brown did no more with regard to BOR's that was the standard practice. Brown actually sent BOR forms to Baker. Baker knew she should not be going after GCIA's established accounts. As early as September 12, 2006, Baker asked to terminate the contract she had signed about two weeks earlier.

Finally, the promissory estoppel claims fail as well. Baker can only point to some vague promises made by Ionescu in November of 2005 and January of 2006. Again, Brown could not reasonably expect that Baker would act to her detriment based on what Ionescu was telling her. Baker knew the business; she knew that GCIA could not easily be terminated and even if notified, would have 30 days to cure. It wasn't the information that Ionescu was giving her that led Baker to attempt to get the GCIA state administrator appointment. It was primarily her own knowledge of the business and desire to have her own company that drove her to make the decisions she made.

Based upon the foregoing, the following ORDER is entered:

## **ORDER**

AND NOW, this 6th day of March, 2008, in accordance with the foregoing memorandum, it is hereby ORDERED that JUDGMENT is entered in favor of

Defendants Brown & Brown, Inc. and Susan Heath, and against Plaintiffs SLB Insurance, Inc., Charlene Leets Baker and Kiristie Berry.

                          BY THE COURT:

                          *s/ Ronald L. Buckwalter, S. J.*
                          RONALD L. BUCKWALTER,    S. J.